IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

EDWARD STRAKA,                    )
                                  )
            Plaintiff,            )
                                  )
      v.                          )        2:10cv726
                                  )        **Electronic Filing**
COMCAST CABLE,                    )
                                  )
            Defendant.            )


## OPINION


Plaintiff commenced this action seeking redress for allegedly being terminated from employment in violation of the Age Discrimination in Employment Act.  Presently before the court is defendant's motion for summary judgment.  For the reasons set forth below, the motion will be granted.

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's claim, and upon which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  When the movant does not bear the burden of proof on the claim, the movant's initial

1

burden may be met by demonstrating the lack of record evidence to support the opponent's claim.  National State Bank v. National Reserve Bank, 979 F.2d 1579, 1582 (3d Cir. 1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574 (1986) (quoting Fed.R.Civ.P. 56 (a), (e)) (emphasis in Matsushita).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" and cannot "simply reassert factually unsupported allegations."  Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).  Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs."  Harter v. GAF Corp., 967 F.2d 846 (3d Cir. 1992).  Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion.  Robertson v. Allied Signal, Inc., 914 F.2d 360, 382-83 n.12 (3d Cir. 1990).  If the non-moving party's evidence merely is colorable or lacks sufficient probative force summary judgment must be granted.  Anderson, 477 U.S. at 249-50; see also Big Apple BMW, Inc. v. BMW of North America, 974 F.2d 1358, 1362 (3d Cir. 1992), cert. denied, 113 S. Ct. 1262 (1993) (although the court is not permitted to weigh facts or competing inferences, it is no longer required to "turn a blind eye" to the weight of the evidence).

The record as read in the light most favorable to plaintiff establishes the background set forth below.  Plaintiff was hired by AT&T Broadband, a predecessor to Comcast Cable ("defendant" or "Comcast"), on February 28, 2000, as an outbound sales representative.  He was fifty years of age at the time.  Defendant dissolved the outbound sales department in late 2007 and transferred plaintiff to the customer loyalty division where he worked as a retention agent.  In this position he received telephone calls from Comcast subscribers who were considering terminating their service agreements.  Plaintiff's job was to address the customers' complaints and attempt to retain their business.

The customer loyalty division receives hundreds of calls from customers each day.  Defendant believes that regular attendance and punctuality by its employees in this department are necessary to ensure that the calls are answered in a timely fashion.  It utilizes an attendance policy in furtherance of this goal.  The policy establishes specific expectations regarding attendance, including disciplinary action for excessive absenteeism.

On March 1, 2008, Comcast implemented a revised attendance policy for the Pittsburgh call center where plaintiff worked.  He received a copy of the new guidelines later that month.  The policy provided for a progressive discipline system based on an employee's attendance record and the accumulation of "events."

Every unscheduled absence was counted as one event.  The policy defined an unscheduled absence as any time off work (full or partial day) that was taken without prior approval from the employee's supervisor or manager.  An unscheduled absence included things such as personal emergencies, vacation, or illness.

Tardiness counted as one-half of an event.  Tardiness was classified as any unapproved time away from job duties, such as returning late from break or leaving work early.

3

Unlike an unscheduled absence or tardiness, a scheduled absence did not count as an event.  A scheduled absence was any time off work that was taken with prior approval from the employee's supervisor or manager.  It included approved vacation days, time missed while on an approved leave of absence (such as Family and Medical Leave), jury duty, military leave, disability leave, workers' compensation leave, personal leave, and bereavement leave.  Employees were permitted to take up to three days of bereavement leave for the death of an immediate family member, such as a parent, without adverse consequences.

An employee's attendance record was considered satisfactory as long as the employee did not exceed nine events during a rolling twelve month period.  If an employee accumulated eight events, he would receive a notice warning informing him that he is approaching an unsatisfactory level.   If nine events were amassed, then a verbal warning was issued.  A written warning was provided after ten events, a final written warning after eleven events, and a review for termination would occur after the accumulation of twelve events within the rolling twelve month period.

Plaintiff received several disciplinary notices based on his attendance record before defendant enacted its new attendance policy.  Nevertheless, plaintiff and all other employees were given a "fresh start" when the new guidelines were implemented on March 1, 2008.  Thus, all previous events were removed from his attendance record.[1]

After March 1, 2008, disciplinary action was issued against plaintiff under the revised policy.  His first event occurred on March 20, 2008.  On this date plaintiff left work before his shift ended after learning that his father's health was failing.  On March 28, 2008 plaintiff

---

[1] The prior attendance policy operated on the number of events an employee accumulated during a six month rolling period.

accrued another event when he left work early due to his father's death.  Following his father's

passing, plaintiff took three days off under Comcast's bereavement policy.

Plaintiff accumulated six more events between March 28, 2008, and October 9, 2008.

After his eighth event plaintiff received a notice warning from his immediate supervisor, Jessica

Erol, and signed a document known as a "responsibility agreement."  By signing the

responsibility agreement plaintiff acknowledged that his first event occurred on March 20, 2008,

and that it would remain on his record for a rolling twelve month period.  However, plaintiff

disputed several of the absences recorded on his attendance record.  He questioned the meaning

of certain notations such as "ebl" and "bsl," and he did not recall missing work or being tardy on

some of the dates on his record.   Erol indicated she would investigate the events.

Plaintiff received a verbal warning and signed another responsibility agreement on

October 29, 2008, after accruing another attendance violation on that day.  In doing so plaintiff

acknowledged he had accumulated nine events.  He also acknowledged that he was aware of

Comcast's attendance policy.

On or around November 4, 2008, plaintiff met with Kelly O'Toole from the human

resources department.  He told O'Toole that he was experiencing high levels of stress in the

customer loyalty division and wanted to transfer to a new department.  He also reported that he

had been repeatedly subjected to ageist comments from his co-workers and prior supervisor Linn

Roberts.  For example, plaintiff had been called "old man" by Roberts and "old cracker" by co-

worker Elliot Williams.  Plaintiff had heard other unidentified coworkers making comments such

as "the old man must be talking to an old person" during his conversations with customers.

Others, including Roberts, repeatedly asked him and made snide comments about when he would

retire.

5

On November 13, 2008 plaintiff received another attendance-related event.  He signed a responsibility agreement acknowledging he had reached ten events within the rolling twelve month period, and he received a written warning.

An additional event and responsibility agreement followed on December 5, 2008. Plaintiff acknowledged he had reached eleven and one half events and that he was receiving a final written warning.  Once again, plaintiff questioned several of the events on his record while meeting with Erol.  He informed her that he had requested a transfer while meeting with O'Toole from human resources.  Erol stated she would review his attendance record, research available course offerings for stress management, and help upload his resume to the company's database.

Plaintiff accrued his final event on December 31, 2008.  He called off on New Year's Eve because his prescription eyeglasses had broken.  He signed a responsibility agreement on January 16, 2009, stating he had reached twelve events in the rolling twelve month period.  The agreement informed him that his employment had been terminated.  He was fifty-nine years of age.

At the time of his termination plaintiff suspected that some of his attendance violations were due to his age based on the discriminatory comments he had heard from supervisor Roberts and his co-workers.  Plaintiff filed a charge with the EEOC.  The instant lawsuit followed after he received a right to sue letter.

Plaintiff contends he was treated disparately because other younger employees could challenge their recorded absences with their supervisors while plaintiff was not afforded the same opportunity.  For example, two younger employees – Richard Bodner and Pete Miller – told plaintiff that their supervisors would inform them when an event was about to be placed on their records and they were able to discuss the matter with their supervisors to provide an

6

explanation or their version of what had happened.[2]  These individuals never informed plaintiff about the outcome of these discussions, i.e., whether the notice and discussions actually resulted in an anticipated event not being recorded or being reduced in severity.  In contrast, although he asked repeatedly, plaintiff alleges no one ever checked into or explained why certain absences were documented on his attendance record and remained there after he raised questions about them.

In addition, plaintiff contends Comcast administered the attendance policy in favor of younger employees.  Specifically, he claims co-worker Elliot Williams left work early in 2008 to buy Christmas presents at the request of supervisor Roberts.  Plaintiff asserts this absence was not marked on Williams' attendance record because he was a younger employee.

Defendant also permitted managers and supervisors to exercise discretion in administering the attendance policy when an employee was reviewed for termination.  One younger employee, Tina Quinn, was reviewed for termination after she accumulated more than twelve events.  Defendant decided to permit her to continue working under a "last chance agreement."  The same opportunity was not extended to plaintiff.

Moreover, plaintiff argues that two of his absences – March 20th and March 28th – resulted from his father's illness and death and should have been removed from his attendance record after he brought them to his supervisor's and the department of human resources' attention.  Although plaintiff admittedly had exhausted his allotted three days of bereavement leave, the human resources department previously had made exceptions for employees reaching an excessive number of absences.  Plaintiff notes that the department had removed multiple

---

[2] Plaintiff estimates Bodner was thirty-five years old and Miller was twenty-six years old at the time.  Neither of these individuals worked for defendant by the time discovery was conducted and both had relocated to other states.

events from another employee's attendance record. Specifically, on June 2, 2009, Comcast waived an absence by employee Alissa Jones on June 27, 2008, because she did not realize that she had run out of FMLA hours. Comcast waived two additional absences by Jones on October 20, 2008, and October 25, 2008, due to a death in her family. According to plaintiff, Comcast's failure to remove the March 20th and March 28th absences from his record establishes a prima facie case of age discrimination given that the company had granted exceptions under similar circumstances to Jones.

Finally, plaintiff argues that Comcast terminated him to avoid paying retirement benefits. To be eligible for the company's stipend program, an employee had to achieve 10 years of service and be at least fifty-seven years old. At the time of his termination, plaintiff was 59 years of age and was only a little more than one year away from the ten year benchmark. Plaintiff contends defendant terminated his employment on the basis of age to avoid paying this stipend upon his retirement.

Defendant moves for summary judgment on the ground that plaintiff has not produced sufficient evidence to support a finding of age discrimination. First, there is insufficient evidence to establish discrimination based on direct evidence. Even if supervisor Roberts called plaintiff an "old man," she was not his supervisor at the time or a decision-maker with respect to plaintiff's discharge. Moreover, these alleged comments purportedly were made nearly a year before plaintiff's termination. Defendant thus asserts that the comments were remote and unrelated to any management decision regarding plaintiff's attendance and do not supply the kind of evidence needed to support a claim of discrimination based on direct evidence.

Defendant contends plaintiff lacks sufficient indirect evidence to support his claim. Defendant asserts that plaintiff fails to establish a prima facie case of age discrimination.

Specifically, plaintiff cannot show that he was qualified for his job.  From defendant's perspective, regular attendance is a prerequisite for an individual to be qualified for employment. Plaintiff had a long history of attendance violations and thus did not meet this requirement.

Moreover, defendant argues that even if plaintiff established a prima facie case, his claim still fails because it had a legitimate reason for his termination.  Plaintiff had twelve attendance violations during the preceding year and thus dismissal was warranted under the policy.

Furthermore, defendant posits that there is no evidence to suggest that it administered its attendance policy in a biased manner or that defendant's use of its attendance policy to terminate plaintiff was a pretext for age discrimination.  Younger employees were subject to and received the same warnings and punishments as plaintiff, and he presents no competent evidence to prove he was treated less favorably.  Thus, Comcast maintains that summary judgment is appropriate.

Finally, defendant asserts plaintiff's retaliation claim must fail as well.  Plaintiff fails to establish a prima facie case of retaliation because there is no causal link between his alleged protected activity and his discharge.  Likewise, there is no evidence that the company's reasons for terminating plaintiff were pretextual. Thus, Comcast contends the retaliation claim is bereft of sufficient proof and it is entitled to summary judgment on all claims in plaintiff's complaint.

It is well-settled that claims of discrimination are to be evaluated at summary judgment using the shifting burdens of proof initially established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  St. Mary Honor Center v. Hicks, 509 U.S. 502, 506 (1993); Waldron v. SL Industries, Inc., 56 F.3d 491, 495 (3d Cir. 1995) (citing Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)).  In order to prevail on a claim of intentional age discrimination, a plaintiff must prove that his or her age actually motivated or had a determinative influence in the adverse employment action in question.  Fasold v. Justice, 409

F.3d 178, 184 (3d Cir. 2005) (citations omitted).  This burden can be met by presenting either

direct evidence of discrimination or indirect evidence that satisfies the three-step process known

as the <u>McDonell Douglas</u> paradigm.

Plaintiff seeks to establish a claim of intentional age discrimination resulting in discharge

through indirect evidence.[3]  A claim under the ADEA based on indirect evidence is evaluated

pursuant to the <u>McDonnell Douglas</u> tripartite burden-shifting analysis.  Under this framework the

parties' respective evidentiary burdens have been summarized as follows:

> First, the plaintiff has the burden of proving by
> the preponderance of the evidence a prima facie case of
> discrimination. Second, if the plaintiff succeeds in proving
> the prima facie case, the burden shifts to the defendant to
> articulate some legitimate, nondiscriminatory reason
> for the [adverse employment action]. Third, should the
> defendant carry this burden, the plaintiff must then have
> an opportunity to prove by a preponderance of the evidence
> that the legitimate reasons offered by the defendant were
> not its true reasons, but were a pretext for discrimination.

<u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 252-253 (1981) (citation

omitted).

Under the indirect evidence approach a plaintiff must present a prima facie case of

discrimination.  <u>Keller v. Orix Credit Alliance, Inc.</u>,130 F.3d 1101, 1108 (3d Cir. 1997).  The

major purpose of the prima facie case is to eliminate the most obvious lawful explanations for

the defendant's adverse employment action and raise a presumptive inference of discrimination.

<u>Pivirotto v. Innovative Systems, Inc.</u>, 191 F.3d 344,  352 (3d Cir. 1999) (citing <u>Burdine</u>, 450 U.S.

at 253-54 ("[t]he prima facie case serves an important function in the litigation: it eliminates the

most common nondiscriminatory reasons for the plaintiff's rejection.")).  A prima facie case

---

[3] Plaintiff does not contend that he has direct evidence of age discrimination.  He does rely on
age-biased comments, but only as circumstantial evidence to show that defendant's proffered
explanation was a pretext for age discrimination.

raises an inference of discrimination because the presumed circumstances, if left unexplained, indicate it is likely that the defendant's actions were based on consideration of impermissible factors. Id. (quoting Furnco Construction Corp. v. Waters, 438 U.S. 567, 577 (1978)).

There is no talismanic formula for presenting a prima facie case. Jones v. School District of Philadelphia, 198 F.3d 403, 411 (3d Cir. 1999) ("the elements of a prima facie case depend on the facts of the particular case"). The relevant inquiry is whether the plaintiff has suffered an adverse employment action under circumstances which raise an inference of unlawful discrimination. Waldron, 56 F.3d at 494. Plaintiff's burden at this step is "minimal" and is viewed as a means of presenting a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination. Id.; see also Furnco Construction Corp. v. Waters, 438 U.S. 567, 577 (1978).

If the plaintiff presents a prima facie case, the second stage of the McDonnell Douglas paradigm requires the defendant to articulate a legitimate explanation for the adverse employment action. Keller, 130 F.3d at 1108. The defendant's burden at this step is one of production, not persuasion, and the court's consideration of it "can involve no credibility assessment." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 509 (1993). If the defendant meets this burden, the presumption of discrimination created by the prima facie case "drops" from the case. St. Mary's Honor Center, 509 U.S. at 511; Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000).

Once the defendant has met its burden of production and provided a legitimate explanation for its adverse employment action, the court's analysis turns to the third and final step of the inquiry, which is usually the most critical in resolving a motion for summary judgment. Jones, 198 F.3d at 410. At this juncture the plaintiff must be afforded the

11

"opportunity to [present evidence that is sufficient to] prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Burdine, 450 U.S. at 253. At trial, the plaintiff must have evidence that could convince the finder of fact "both that the [defendant's] reason was false, and that discrimination was the real reason." St. Mary's Honor Center, 509 U.S. at 515. This is because while the burden of production under the McDonnell Douglas analysis shifts, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Jones, 198 F.3d at 410 (quoting Burdine, 450 U.S. at 252-53 (1981)).[4]

### *Analysis*

Plaintiff establishes a prima facie case of age discrimination. In general, a plaintiff may establish a prime facie case by demonstrating that (1) he is a member of a protected class, (2) he

---

[4] Defendant argues that the requirement of "but for" causation as emphasized by the Supreme Court in Gross v. FBL Financial Services, Inc., 129 S. Ct. 2343 (2009), applies to its decision to terminate plaintiff. The Court's analysis in Gross involved a mixed motives analysis under Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). Gross, 129 S. Ct. 2343. It explained that unlike a mixed motives case under Title VII where the burden of persuasion shifts to the plaintiff after he or she sufficiently has demonstrated that both permissible and impermissible motives were at play in the decision or action at hand, the ADEA has never been amended to endorse such an approach. Id. at 2349. Accordingly, the traditional approach in employment cases mandates that the plaintiff retain the burden of proving causation and persuading the finder of fact that the illegal criterion was a substantial factor that had a direct impact in the adverse employment action. Id. at 2351. To the extent defendant is implying that the Court's use of the phrase "but for" causation should be understood as requiring a showing of sole causation, the contention is misplaced. See Smith v. City of Allentown, 589 F.3d 684, 690 (3d Cir. 2009) (reiterating that the burden of persuasion remains with the plaintiff at all times under the McDonnell Douglas burden shifting analysis, including the burden of proving "but for" causation) (citing Starceski v. Westinghouse Elec. Corp., 54 F.3d 1088, 1096 n.5 (3d Cir. 1995) ("In Miller[v. CIGNA Corp., 47 F.3d 586, 593-94 (3d Cir. 1995)], we rejected the statement in Griffiths [v.CIGNA Corp., 988 F.2d 457 (3d Cir. 1993)] that an employee advancing a McDonnell Dogulas/Burdine pretext theory must show that invidious discrimination is the 'sole cause' of his employer's adverse action.")).

was qualified for the position, (3) he suffered an adverse employment action, and (4) the circumstances raise an inference of discrimination, such as where similarly situated individuals outside the protected class were treated more favorably.  See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510 (2002); see also  Sheridan v. E. I. DuPont de Nemours & Co., 100 F.3d 1061, 1066 n. 5 (3d Cir. 1996) (en banc), cert. denied, 521 U.S. 1129 (1997) (discussing nature and purpose of prima facie case).  The central focus of the inquiry is always whether the employee is being treated less favorably because of a protected trait.  Pivirotto, 191 F.3d at 352 (quoting International Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n. 15 (1977)).  In short, the plaintiff must be able to point to "evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion."  Id. at 355.  (quoting O'Connor v. Consolidated Coin Caterer's Corp., 517 U.S. 308, 312 (1996)).

It is undisputed that plaintiff was a member of the protected class.  Plaintiff was born on November 23, 1949, and was over forty years of age at the time of his termination.

Plaintiff was qualified for his position.  In determining whether a plaintiff was "qualified" for a position, the court must consider whether the plaintiff had the objective experience and education necessary to qualify as a viable candidate for or maintain the position of employment. Kennedy v. Chubb Group of Ins. Cos., 60 F. Supp.2d 384, 391 n.1 (D. N.J. 1999) (citing Sempier v. Johnson & Higgins, 45 F.3d 724, 729 (3d Cir. 1995) ("We determine a plaintiff's qualifications for purposes of proving a prima facie case by an objective standard .") (citations omitted).  As previously noted, the plaintiff's burden of production at this stage is minimal and is to be viewed as part of a sensible and orderly way of organizing and analyzing the evidence. Waldron, 56 F.3d at 494.

Here, plaintiff was employed by Comcast since February 28, 2000.  He maintained a position within the customer loyalty division from late 2007 until his termination on January 16, 2009.  There was never any dissatisfaction with plaintiff's actual work performance during this time.  Thus, there can be no question that plaintiff had the education and experience needed to maintain the position and Comcast's arguments to the contrary are unavailing.

Plaintiff suffered an adverse employment action.  He was terminated on January 16, 2009.

Finally, the attendant circumstances raise an inference of discrimination.  Plaintiff presents evidence which if left unexplained indicates that younger employees such as Jones, Miller, Bodner, and Williams were treated differently under defendant's attendance policy and it was misapplied to him.

Turning to the second step of the McDonnell Douglas analysis, defendant proffers a legitimate explanation for plaintiff's termination: neutral application of its attendance policy.  Plaintiff cannot dispute that his attendance record reflected the requite number of events for termination.  Plaintiff had amassed 12 events in the rolling 12 month period and he signed acknowledgements after accruing his eighth, ninth, and tenth events which reiterated each event on his attendance record.  Plaintiff again signed a responsibility agreement on December 5, 2008, after accumulating eleven and one half events.  Through each of these responsibility agreements plaintiff acknowledged that the prior events continued to remain on his record and, by inference, that the next event would trigger the next level of discipline.  Plaintiff reached 12 events when he called off on New Year's Eve and was terminated after review on January 16, 2009.

Defendant also offers evidence that it did not act arbitrarily against plaintiff.  It terminated 2 younger employees on the same day as plaintiff and terminated 161 employees

14

between January 1, 2007 and March 16, 2011, and 122 of these employees were under the age of

forty.[5]  This explanation sufficiently shifts the burden to plaintiff to establish that the record will

support a finding of discrimination by pretext or otherwise.

The third step of the analysis is often the most critical.  Fasold, 409 F.3d at 185

("Therefore, this case, like many ADEA actions, turns on the final step of the McDonell Douglas

framework ....").  At this juncture the inquiry turns to whether the plaintiff has presented

sufficient evidence to allow a reasonable finder of fact to find by a preponderance of the

evidence that the defendant's proffered reasons are a pretext for invidious discrimination.  Id.

The United States Court of Appeals for the Third Circuit has summarized the plaintiff's

burden at summary judgment on this step as follows:

> Specifically, in Fuentes v. Perskie, 32
> F.3d 759 (3d Cir. 1994), and later in Sheridan
> [E.I. DuPont de Nemours and Co., 100 F.3d
> 1061 (3d Cir. 1996) (en banc)], we stated that a
> plaintiff may defeat a motion for summary judgment
> (or judgment as a matter of law) by pointing "to some
> evidence, direct or circumstantial, from which a factfinder
> could reasonably either: (1) disbelieve the employer's
> articulated legitimate reasons; or (2) believe that
> an invidious discriminatory reason was more
> likely than not a motivating or determinative
> cause of the employer action."  Fuentes, 32 F.3d
> at 764; Sheridan, 100 F.3d at 1067.

Jones, 198 F.3d at 412-13.  Under the first approach, the finder of fact's rejection of the

defendant's proffered explanation allows, but does not compel, a finding of discrimination and

---

[5]  Plaintiff's attempt to avoid the import of this evidence on the ground that it was not timely or
properly disclosed during discovery is misplaced.  Defendant disclosed the names of  three of
these individuals as part of its initial disclosures and provided the entire list of individuals in
response to plaintiff's requests for production and interrogatories.  That the disclosures were
produced in the form of a chart or spread-sheet is of no moment.  Plaintiff had more than ample
time to pursue appropriate follow-up discovery on these disclosures and obtain any additional
underlying information or data deemed necessary.  Consequently, the information properly is
considered at this juncture.

judgment for the plaintiff.  Sheridan, 100 F.3d at 1061; Reeves, 530 U.S. at 147 ("In appropriate

circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the

employer is dissembling to cover up a discriminatory purpose.").  In other words, once a

defendant's justification has been discredited, a jury is entitled to infer that discrimination is the

most likely alternative explanation, particularly because the defendant is in the best position to

explain the actual reason for its decision.  Reeves, 530 U.S. at 147.  "Thus, a plaintiff's prima

facie case, combined with sufficient evidence to find that the employer's asserted justification is

false, may permit the trier of fact to conclude that the employer unlawfully discriminated."  Id. at

148; Sheridan, 100 F.3d at 1061 (same).

     "To discredit the employer's proffered reason ... the plaintiff cannot simply show that the

employer's decision was wrong or mistaken, since the factual dispute at issue is whether

discriminatory animus motivated the employer, not whether the employer is wise, shrewd,

prudent, or competent."  Fuentes, 32 F.3d at 765.  Instead, the plaintiff must come forward with

evidence that demonstrates "such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for its actions that a reasonable

factfinder could rationally find them unworthy of credence, and hence infer that the employer did

not act for the asserted non-discriminatory reasons."  Id. (citations omitted).  In meeting this

burden the plaintiff need not cast doubt on every explanation advanced by the defendant, but

rather is only required to present sufficient evidence from which a factfinder reasonably could

infer that each of the employer's proffered non-discriminatory reasons is unworthy of credence.

Id. at 764.  For example, "[i]f the defendant proffers a bagful of legitimate reasons, and the

plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to

discredit the remainder."  Id. at 764 n. 7. "That is because the factfinder's rejection of some of

the defendant's proffered reasons may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available." Id.

Plaintiff marshals the following in an effort to discredit defendant's explanation and show that the decision to terminate him was based in part on age. First, defendant permitted managers and supervisors to exercise discretion in determining whether an employee received an event for an unscheduled absence and/or to eliminate or waive events under extenuating circumstances. Similarly, the review at twelve events did not mandate that an employee be terminated. An exception could be made and an employee could remain working under a last chance agreement. Nevertheless, defendant's managerial and human resources personnel gave conflicting accounts about whether there was such discretion under the attendance policy and under what circumstances any such discretion could be exercised.

Against this backdrop defendant misapplied its policy to plaintiff. Plaintiff was at work on March 20, 2008, when he received word that his terminally ill father had taken a turn for the worst. Thinking that his father's passing was imminent, plaintiff informed his supervisor and left work to see his father. Plaintiff again left work on March 28, 2008, after receiving word that his father had just passed away. Plaintiff again informed his supervisor of the circumstances before leaving. Although his supervisor retained the discretion not to treat these emergency situations as events, they were recorded as such on plaintiff's record.

When plaintiff received a notice warning in October of 2008, he questioned some of the events on his record. He could not remember or disagreed with several of them. He raised these concerns when additional warnings were issued. Erol repeatedly said she would look into the matter but never got back to plaintiff. In contrast, younger employees – specifically Bodner and

Miller – were informed by their supervisor(s) that an event was going to be recorded on their record and they were given an opportunity to tell their side of the story.  Plaintiff was not afforded the same opportunity.  Another younger employee – specifically Elliot Williams – was permitted to leave early without accruing an attendance violation.

Plaintiff further asserts that all of the above occurred in a corporate culture permeated with discriminatory animus based on age.  Roberts, one of plaintiff's prior managers, frequently called plaintiff "old man" and made statements such as "come on old man, let's go, we've got a meeting."  These remarks were made when plaintiff was one of the oldest, if not the oldest, employee in the department.  Employees referred to plaintiff as "old cracker" and "old man" and made comments that were laced with age bias.  The employees would ask and make snide comments about when plaintiff was going to retire.  They would jeer when they thought plaintiff was talking to an older individual.  Plaintiff reported this atmosphere to O'Toole in November of 2008, but nothing was done.

Plaintiff's proffered evidence in support of establishing pretext is insufficient as a matter of law.  It is well-settled that an evaluation of whether the evidence as a whole is sufficient to establish pretext is a fact-based inquiry.  Kautz v. Met-Pro Corp., 412 F.3d 463, 468 (3d Cir. 2005) (citing Simpson, 142 F.3d at 646).  In undertaking this inquiry "[t]he question is not whether the employer made the best or even a sound business decision; it is whether the real reason is discrimination."  Keller, 130 F.3d at 1109.  A mere showing that the employer's decision was wrong or mistaken is insufficient because the real issue is whether discriminatory animus motivated the employer's decision, not whether the employer was wise, shrewd, prudent or competent in making the decision.  Fuentes, 32 F.3d at 765.

18

Plaintiff's evidence demonstrates little more than defendant did not make a shrewd or insightful decision about whether dismissal was warranted in light of plaintiff's attendance record.  In other words, it falls short of a sufficient quantum of probative evidence to permit a finding that defendant's proffered explanation was pretext for age discrimination.

First, plaintiff's evidence concerning Bodner and Miller does not appear to be admissible. Although a plaintiff is not required to reduce all information to admissible evidence at summary judgment, information in the form of inadmissible evidence may only be considered where it is likely that the information can be reduced to admissible evidence at trial.  See J.F. Fesser, Inc., v. Serv-A-Portion, Inc., 909 F.2d 1524, 1542 (3d Cir. 1990); Shelton v. Univ. of Med. & Dentistry of N.J., 223 F.3d 220, 223 n.2 (3d Cir.2000) ("In this circuit, hearsay statements can be considered on a motion for summary judgment if they are capable of admission at trial."). Plaintiff's account of Bodner and Miller receiving more favorable treatment is derived solely from those two individual's statements made to plaintiff on the job.  Plaintiff did not develop any evidence from defendant's principals that would provide independent evidence of the events relayed in these individuals' statements.  Nor has he listed these two as witnesses on his pretrial statement.  See Plaintiff's Pretrial Statement (Doc. No. 20) at "C. Liability and Damages Witnesses."  As such, the statements are classic hearsay which must be excluded under Federal Rule of Evidence 802 and cannot be used to defeat a motion for summary judgment.[6]  See Smith v. City of Allentown, 589 F.3d 684, 693 (3d Cir. 2009) ("Hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment."); accord

---

[6] Even assuming for the sake of argument that the statements could be reduced to admissible evidence, any probative value attributable to the statements is greatly diminished by the fact that plaintiff cannot say whether the notice and chance to explain ever made a difference in changing the anticipated events which were being placed on Bodner and Miller's records.  If the notice and chance to explain did not change management's account and treatment of the events, plaintiff was not deprived of any meaningful opportunity or treated differently in any probative manner.

McGrath v. Lumbermens Merchandising Corp., 851 F. Supp.2d 855, 857 (E.D. Pa. 2012); White v. Brown, 408 Fed. Appx. 595, 599 (3d Cir. 2010).

Second, plaintiff's attempt to raise the specter of discriminatory animus by comparing himself with defendant's treatment of Quinn, Jones and Williams lacks persuasive force.  None of these individuals were similarly situated to plaintiff.

Quinn had to take leave due to the unexpected death of both parents on separate occasions.  She was given additional bereavement leave due to these extenuating circumstances and before coming under the supervision of Erol.  Thereafter, she accumulated 12 or more absences because she had to take time off due to her family circumstances.  She came up for review after a final written notice was issued.  Quinn assessed the situation, understood the potential repercussions and decided to resign instead of risking termination.  Human Resources never made a decision about whether she would be terminated due to excessive absences. Deposition of Jessica Erol (Doc. No. 32-4) at 10-12.

Jones was on Family Medical Leave Act leave and did not realize that she had used all of the leave before returning.  She was given an extra day of leave after returning.  Jones also was off October 20, 2008, and had a shift interruption on October 28, 2008, which were recorded as events.  These events were later removed because they were generated due to a death in the family.  In October of 2009 Jones was issued a last chance agreement in lieu of review for termination after  she amassed sufficient events under the attendance policy as revised in July of 2009.  Comcast Documents (Doc. No. 32-9) at 4-7.

Williams was asked by Roberts to go do some Christmas shopping for her in December of 2008.  He was permitted to leave his shift early and did not receive any negative treatment under the attendance policy.  Plaintiff's Deposition (Doc. No. 25) at 19 (p. 115).

None of the above are sufficiently similar individuals for the purposes of comparison. Quinn did receive extra bereavement days due to the death of both of her parents on separate occasions.  After she accumulated additional events she came up for termination review.  She elected to resign instead of undergoing the review.

Plaintiff sought to have waived two early departures after learning of his father's failing health and death.  He took the allotted three days of bereavement leave after his father died and sought to gain additional bereavement time after his attendance became an issue.  He did not seek an additional allotment of bereavement leave after the death of a second family member.

Jones had two events removed based on a death in the family.  After her attendance became an issue one day was restored due to a mistake about the duration of her approved leave under the Family Medical Leave Act and two events were removed for a death in the family. The record does not show that she had been afforded any bereavement leave for that death.

In contrast, plaintiff admittedly received the three days allotted for bereavement of a family member.  He sought to have two additional events removed due to the same family member's death.  In other words, he sought to have defendant's agents exercise their discretion and allotted him five bereavement days instead of three.

Williams got his supervisor's approval to leave early to do some Christmas shopping. Plaintiff admitted that Williams left to get presents for Roberts.  In other words, Williams was asked to run an errand for Roberts and after gaining permission from his supervisor his time away was not documented as an event.

Plaintiff did not have any events from performing tasks that were given to him by his supervisor.  Except for the fact that each employee was away from work there is nothing

comparable between the treatment of Williams and the discretion plaintiff sought to have Erol and the supervisors from human resources exercise in his favor.

In short, plaintiff has failed to select comparators who were treated differently under similar circumstances.  As such, the probative force of his comparisons in treatment is not probative of discriminatory animus based on age.  See Simpson v. Kay Jewelers, 142 F.3d 639, 645-47 (3d Cir. 1998).  (When utilizing a defendant's comparative treatment of others to raise an inference of discrimination the plaintiff "cannot selectively choose a comparator" who was not similarly situated, but instead must point to evidence that is probative of unequal treatment motivated by discriminatory animus.).   Plaintiff concedes that defendant retained discretion in the administration of its attendance policy and he does not provide any evidence to establish that the authority to exercise that discretion was implemented in a biased manner based on age.

In short, plaintiff's evidence of different treatment among employees of the customer services department will support a finding that defendant's decision to terminate plaintiff upon review may not have been a sound, fair or wise decision.  It may have been premature,  unbridled and harsh.  That the decision may have been wrong, unfair, and harsh, however, does not amount to evidence that the decision "was so implausible, inconsistent, incoherent or contradictory that it must be a pretext for something else."  Kautz, 412 F.3d at 471 (collecting cases in support).

Against this backdrop plaintiff's evidence of a corporate culture of ageism adds very little to support a finding of disparate treatment.  Plaintiff concedes that Roberts was not his supervisor when he started to receive notices pursuant to the attendance policy and there is no evidence that she was involved in or consulted about plaintiff's review and discharge.  She made the remarks well before plaintiff's unexcused absences grew to a point of concern.  Consequently, her comments do not carry the poisonous venom claimed by plaintiff and are

entitled to little weight in the sufficiency of the evidence analysis mandated by defendant's motion.  See  Walden v. George-Pacific Corp., 126 F.3d 506, 521 (3d Cir. 1997) ("Our cases distinguish between discriminatory comments made by individuals within and those by individuals outside the chain of decisionmakers who have the authority [over the employee].");  Abramson, 260 F.3d at 286 ("Under our case law, it is sufficient if those exhibiting discriminatory animus influenced or participated in the [adverse employment decision]" (collecting cases in support)); Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992) (stray remarks by non-decision makers or even by decision-makers unrelated to the decision process are minimally probative, particularly where such statements are made in a context removed from the actual decision-making process); Silver v. American Institute of Certified Public Accounting, 2006 WL 3511342, *2 (3d Cir. 2006) ("We note that stray remarks by decision-makers unrelated to the decision-making process, are rarely given weight, particularly if they are made temporally remote from the date of the decision.");  Fletcher v. Lucent Technologies, Inc., 2006 WL 2844262, *2 (3d Cir. 2006) (same).

Finally, plaintiff's contention that his anticipated participation in the post-retirement stipend program supplies evidence of motive for defendant to engage in age discrimination is misplaced.  The program provides retired employees with a stipend over their retirement upon meeting the eligibility requirements: the employee must be 57 years of age and have accrued 10 years of continuous service.  Plaintiff was 59 years of age when he was discharged.  He was approximately 13 months shy of 10 years of service.  Plaintiff notes that his vesting in the program would have obligated defendant to pay a stipend for him and his wife for many years, which can be viewed as a strong monetary incentive for improper termination.

The difficulty with this argument is multifold.  First, the Supreme Court rejected the fundamental premises of plaintiff's position years ago.  In <u>Hazen Paper Co. v. Biggins</u>, 507 U.S. 604 (1993), the Court rejected the proposition that precluding an employee from vesting under a benefit plan based on years of service can be a proxy for age discrimination.  It opined:

> In a disparate treatment case, liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision.  The employer may have relied upon a formal, facially discriminatory policy requiring adverse treatment of employees with that trait.  Or the employer may have been motivated by the protected trait on an ad hoc, informal basis. Whatever the employer's decisionmaking process, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome.
>
> Disparate treatment, thus defined, captures the essence of what Congress sought to prohibit in the ADEA.  It is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age.  As we explained in <u>EEOC v. Wyoming</u>, 460 U.S. 226 . . . (1983), Congress' promulgation of the ADEA was prompted by its concern that older workers were being deprived of employment on the basis of inaccurate and stigmatizing stereotypes.

> > Although age discrimination rarely was based on the sort of animus motivating some other forms of discrimination, it was based in large part on stereotypes unsupported by objective fact. . . .  Moreover, the available empirical evidence demonstrated that arbitrary age lines were in fact generally unfounded and that, as an overall matter, the performance of older workers was at least as good as that of younger workers. <u>Id.</u>, at 231.

Thus the ADEA commands that "employers are to evaluate [older] employees ... on their merits and not their age." <u>Western Air Lines, Inc. v. Criswell</u>, 472 U.S. 400, 422 . . . (1985). The employer cannot rely on age as a proxy for an employee's remaining characteristics, such as productivity, but must instead focus on those factors directly.

> When the employer's decision is wholly motivated by factors other than age, the problem of inaccurate and stigmatizing stereotypes disappears. This is true even if the motivating factor is correlated with age, as pension status typically is. Pension plans typically provide that an employee's accrued benefits will become nonforfeitable, or "vested," once the employee completes a certain number of years of service with the employer. <u>See</u> 1 J. Mamorsky, Employee Benefits Law § 5.03 (1992).   On average, an older employee has had more years in the work force than a younger employee, and thus may well have accumulated more years of service with a particular employer. Yet an employee's age is analytically distinct from his years of service. An employee who is younger than 40, and therefore outside the class of older workers as defined by the ADEA, see 29 U.S.C. § 631(a), may have worked for a particular employer his entire career, while an older worker may have been newly hired.  Because age and years of

24

service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily age based.

The instant case is illustrative. Under the Hazen Paper pension plan, as construed by the Court of Appeals, an employee's pension benefits vest after the employee completes 10 years of service with the company. Perhaps it is true that older employees of Hazen Paper are more likely to be "close to vesting" than younger employees. Yet a decision by the company to fire an older employee solely because he has nine-plus years of service and therefore is "close to vesting" would not constitute discriminatory treatment on the basis of age. The prohibited stereotype ("Older employees are likely to be ___") would not have figured in this decision, and the attendant stigma would not ensue. The decision would not be the result of an inaccurate and denigrating generalization about age, but would rather represent an accurate judgment about the employee - that he indeed is "close to vesting."

Id. at 610-14 (citations omitted).

Instead, for vesting to serve as a basis for liability under the ADEA there must be evidence to support a finding that the employer drew or operated on a correlation between an employee approaching pension status and his or her decline in  production and competency.  Cf. at 614  ("Pension status may be a proxy for age, not in the sense that the ADEA makes the two factors equivalent, cf. Metz, 828 F.2d, at 1208 (using "proxy" to mean statutory equivalence), but in the sense that the employer may suppose a correlation between the two factors and act accordingly.  Nor do we rule out the possibility of dual liability under ERISA and the ADEA where the decision to fire the employee was motivated both by the employee's age and by his pension status.  Finally, we do not consider the special case where an employee is about to vest in pension benefits as a result of his age, rather than years of service, see 1 Mamorsky, supra, at § 5.02[2], and the employer fires the employee in order to prevent vesting.").  In other words, terminating an employee in order to prevent vesting due to years of service does not in itself provide evidence of age discrimination.  See Jakimas v. Hoffmann-La Roche, Inc., 485 F.3d 770, 789 (3d Cir. 2007) ("But, even if Roche terminated the Appellants, specifically Meechan, to avoid paying

future pension benefits, under <u>Hazen Paper</u> this does not prove that age was a determinative factor in Roche's decision.  Absent proof that younger employees were treated more favorably, Meechan has not proved his prima facie case.).

Here, plaintiff reached the vesting age of fifty-seven approximately two years before he was terminated.  Thus, the age component was not a play when defendant took the challenged adverse employment action.

It follows that plaintiff's contentions concerning defendant's motivations necessarily are premised on plaintiff's years of service.  Assuming the accuracy of such contentions, they do not supply evidence of age discrimination.  Furthermore, the record is completely devoid of any evidence from which an inference can be drawn that defendant perceived workers approaching the years of service requirement as tending to decline in productivity and competency.   Consequently, that plaintiff was nearing the years of service needed for vesting under the post-retirement stipend program does not supply evidence of age discrimination.

Second, plaintiff's reliance on the post-retirement stipend program is unavailing on an additional ground.  Plaintiff has not advanced any evidence to support a causal connection between defendant's decision to terminate plaintiff and plaintiff nearing the years of service needed for vesting under the program.  Tellingly, the best argument plaintiff can muster about a causal nexus is to posit that "[i]t is not inconceivable that Defendant would have terminated Plaintiff, in part, to prevent his attainment of eligible status for participation in this Stipend Program."  Plaintiff's Brief in Opposition (Doc. No. 30) at 18.  He goes on to highlight the financial costs as a ground to infer nefarious motive.  Of course, such reasoning is founded on nothing more than speculation and conjecture, which are not

sufficient to satisfy the burden created by defendant's motion.  <u>Robertson</u>, 914 F.2d at 382-83 n.12 (speculation and conjecture cannot defeat a supported motion for summary judgment).[7]

Collectively the various strands of evidence plaintiff seeks to weave together in support of his disparate treatment claim carry no additional probative force.  Plaintiff bears the burden of showing that some of the defendant's proffered reasons are pretextual in a way that the defendant's credibility is seriously undermined, thereby throwing all of the defendant's proffered reasons into doubt.  <u>Kautz</u>, 412 F.3d at 467-68 ("We have applied the principles explained in <u>Fuentes</u> to require plaintiffs to present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision.") (citing <u>Stanziale v. Jargowsky</u>, 200 F.3d 101, 106 (3d Cir.2000) and <u>Keller</u>, 130 F.3d at 1110 in support)).  The import of the whole of plaintiff's evidence amounts to no more than the sum of its parts.  The circumstances underlying plaintiff's prima facia case are of minimal probative force in creating  an inference of discrimination, and, at best, plaintiff's evidence of pretext supports only the proposition that

---

[7] Plaintiff's efforts to extrapolate evidence of age discrimination from the raw data concerning participants in the stipend program suffers from similar shortcomings.  Statistical evidence can be used to establish pretext in a disparate treatment case.  <u>See</u> <u>Bruno v. W.B. Saunders Co.</u>, 882 F.2d 760, 767 (3d Cir. 1989).  Such evidence can show a pattern or practice that is indicative of discriminatory animus.  <u>Ezold</u>, 983 F.2d at 542.  But to have significant probative force, the evidence must be accompanied by an "analysis of either the qualified applicant pool or the flow of qualified candidates over a relevant time period." <u>Id.</u>; accord <u>Wards Cove Packing Co. v. Atonio</u>, 490 U.S. 642, 650-51 (1989).  In contrast, "raw numerical evidence alone is of little value without a demonstration of its significance to the employer's alleged discriminatory motive."  <u>Tomblin v. Renda Broadcasting Corp.</u>, 2008 WL 793880, * 9  (W.D. Pa. March 24, 2008) (Conti, J.) (citing <u>Ezold</u>, 983 F.2d at 543) ("Raw numerical comparisons," unaccompanied by "any analysis of either the qualified applicant pool or the flow of qualified candidates over a relevant time period" are insufficient to create a fact issue as to pretext because no conclusion can be drawn from them.); <u>Keller</u>, 130 F.3d at 1112 (same).  The extrapolations plaintiff attempts to draw from the raw data supplied by defendant are not qualified by any statistical analysis showing the applicable pool of potential participants, a statistical accounting of other causes and a statistical derivation that accounts for more than random chance.  Consequently, the inferences plaintiff seeks to draw from the raw data are nothing more than rank speculation.

defendant permitted its managers and supervisors to exercise a modest degree of discretion in administering its attendance policy.  Plaintiff has not set forth sufficient evidence to support a finding that the exercise of that discretion was used as a proxy for age discrimination.  Because his evidence does not undermine in any meaningful way the core facts and basic underpinnings advanced by defendant, plaintiff's evidence fails to impugn defendant's proffered explanation in a manner that will permit a finding of pretext.  See Keller, 130 F.3d at 1110; Fuentes, 32 F.3d at 765.  Accordingly, the record shows only that defendant did not make a shrewd or insightful decision about whether dismissal was warranted in light of plaintiff's attendance record and its motion for summary judgment on plaintiff's disparate treatment claim must be granted.

Plaintiff's efforts to maintain a retaliation claim fare no better.  A prima facie case of retaliation requires the plaintiff to proffer evidence demonstrating the following: "(1) [he] engaged in conduct protected by [the ADEA]; (2) after or contemporaneous with engaging in that conduct, [his] employer took an adverse action against [him]; (3) the adverse action was 'materially adverse'; and (4) there was a causal connection between [his] participation in the protected activity and the adverse employment action."  Hare v. Potter, 220 Fed. Appx. 120, 127 (3d Cir. 2007).[8]  Plaintiff's retaliation claim is controlled by the three-step burden shifting McDonnell Douglas analysis, as outlined above.  See Moore v. City of Philadelphia, 461 F.3d 331, 342 (3d Cir. 2006) ("If the employee establishes this prima facie case of retaliation, the familiar McDonnell Douglas approach applies.").

In Burlington, the Supreme Court clarified that the anti-retaliation provision is not limited to "workplace-related or employment-related retaliatory acts and harm."  Furthermore, it is not to

---

[8] Title VII jurisprudence applies with equal force to claims made under the ADEA because "the substantive provisions of the ADEA 'were derived in haec verba from Title VII.' "  Trans World Airlines, Inc., 469 U.S. at 121 (quoting Lorillard v. Pons, 434 U.S 575, 584 (1978)).

be construed as "forbidding the same conduct prohibited by the antidiscrimination provision."
Id.  Retaliatory actions can be found to be "materially adverse" if they would have the effect of
"dissuad[ing] a reasonable worker from making or supporting a charge of discrimination."
Burlington, 548 U.S. at 2415 (what is materially adverse "often depends on a constellation of
surrounding circumstances, expectations, and relationships which are not fully captured by a
simple recitation of the words used or the physical acts performed").

      The record also must contain sufficient evidence from which the finder of fact can link
the materially adverse action to retaliatory animus.  Moore, 461 F.3d at 346.  Two central factors
are brought into play: (1) the "temporal proximity" between the protected activity and the alleged
retaliation and (2) the existence of any "'pattern of antagonism in the intervening period.'" Id.
(quoting Abramson, 260 F.3d at 288 (quoting Woodson, 109 F.3d at 920-21)). "Timing alone
raises the requisite inference when it is "unusually suggestive of retaliatory motive." Id.  "But
even if 'temporal proximity . . . is missing, [it is appropriate to]  look to the intervening period
for other evidence of retaliatory animus." Id. (quoting Krouse v. American Sterilizer Co., 126
F.3d 494, 503-04 (3d Cir.1997)).  However, "[t]hese are not the exclusive ways to show
causation" and it is important to consider all of the proffered evidence as a whole to determine
whether it "may suffice to raise the inference." Id.  (quoting Farrell, 206 F.3d at 280 and citing in
support Kachmar v. SunGard Data Systems, Inc., 109 F.3d 173, 178 (3d Cir.1997) ("The element
of causation, which necessarily involves an inquiry into the motives of an employer, is highly
context-specific.")).

      Finally, if the plaintiff proffers sufficient evidence to establish a prima facie case, the
burden shifts to defendant to advance a legitimate explanation for any treatment brought into
question.  If the employer meets that burden, plaintiff must come forward with sufficient

evidence to "overcome the non-retaliatory explanation" and permit a finding of retaliatory discrimination.  Id.

Plaintiff engaged in protected conduct when he reported that Roberts had made ageist comments while she was his supervisor and that co-workers made harassing age-biased remarks. Adverse action was taken against plaintiff when he was fired.  Thus, the first two elements are not in dispute for the purposes of the instant motion.

Plaintiff contends that under a pretext analysis the record will support a causal connection between his reporting the ageist and age-biased comments to O'Toole in November of 2008 and his termination in January of 2009.   Specifically, the termination occurred just two months after the protected conduct.  Erol failed to look into plaintiff's complaints and concerns about certain entries on his attendance record.  She likewise did not follow-up on plaintiff's request for assistance in transferring to another department, which was a task that Erminger had asked her to do as well.  No investigatory file was created regarding plaintiff's complaints about the biased atmosphere and the comments did not cease.  No change was made to plaintiff's attendance record and his actual performance was not taken into account when he was reviewed for termination.  Plaintiff thus maintains that had he been afforded the leeway that defendant afforded to other younger employees, he would not have been "unceremoniously terminated due to defendant's discriminatory and inconsistent application of the attendance policy."

The record lacks sufficient evidence to support a finding that a causal nexus existed between plaintiff's complaints about an age-biased and age-hostile environment and his termination.  Admittedly, the two events are separated by only two months.  But mere propinquity in itself seldom has been deemed to be solid foundation for finding a causal relationship.  See Williams v. Philadelphia Housing Authority Police Dept., 380 F.3d 751, 759

(3d Cir. 2004) (surveying Third Circuit cases where temporal proximity has been deemed to be unusually suggestive and rejecting proposition that two months was "unduly suggestive.").  To endorse such reasoning is to commit the fallacy of *post hoc ergo propter hoc*.  It is timing in a context of circumstances that make the temporal proximity more or less suggestive.  See Jalil v. Avdel Corp., 873 F.3d 701, 708 (3d Cir. 1989) (Termination two days after defendant received notice of the plaintiff's EEOC claim following tumultuous employment relationship that had resulted in the plaintiff's repeated termination was unduly suggestive.).

Moreover, "the mere fact that adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir. 1997).  Where "temporal proximity is not so close as to be unduly suggestive," the Third Circuit has observed that "timing plus other evidence may be an appropriate test . . . . " Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir.2003) (quoting Estate of Smith v. Marasco, 318 F.3d 497, 513 (3d Cir.2003)); accord Farrell v. Planters Lifesavers Co., 206 F.3d 701, 708 (3d Cir. 1989).

Here, there is nothing in the context or setting which makes the timing between plaintiff's protected activity and his discharge unduly suggestive.  Thus, plaintiff cannot rely on timing alone to supply sufficient evidence to support a finding of a causal relationship or nexus.

The record is devoid of other evidence to support a sound causal relationship.  The age-biased and age-based comments occurred  months before plaintiff engaged in the protected activity and there is no evidence that such comments were pervasive or that they became worse after he reported them to O'Toole.  There is no evidence to suggest plaintiff felt compelled to file

31

a formal complaint under defendant's anti-harassment policy and then defendant simple chose to ignore a hostile work environment that had repeatedly been brought to its attention.

Similarly, there was no ongoing antagonism between plaintiff and Roberts. Roberts had not been plaintiff's supervisor for several months. There is no evidence that Erol or any other supervisory employee of defendant had engaged in similar conduct at any time, let alone directly after plaintiff reported the conduct to O'Toole. Saying it is so does not suffice. Harter v. GAF Corp., 967 F.2d 846 (3d Cir. 1992) (a party cannot "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs" to defeat a supported motion for summary judgment); Conyette v. Westmoreland County, 2005 WL 3447907, *7 (W.D. Pa. 2005) ("Of course, saying it does not make it so and it is plaintiff's obligation to come forward with affirmative proof from which the finder of fact can [find the necessary requirement has been satisfied]."); accord General Refractories Co. v. Allstate Ins. Co., 1995 WL 71044 (E.D. Pa. Feb. 22, 1995).

The only evidence of antagonism plaintiff points to is the failure of Erol and/or Erminger to get back to him about his request to waive, combine or overlook certain events that he could not recall or disputed on his attendance record and that they failed to assist him in effectuating a transfer to another department after he complained about the working environment. And "his unblemished performance record" was not taken into account when the decision to terminate was made.

The above falls far short of the quantum of evidence needed to support a finding of an ongoing relationship or episode of antagonism. Plaintiff does not dispute the legitimacy of the four absences and thus "events" he elected to accrue between his meeting with O'Toole and his review for termination. That he continued to raise his objection to certain prior events while

acknowledging the state of his attendance record does not create a factual history of antagonism that will support a finding of a causal connection. Nor does the notion that defendant failed to take account of plaintiff's unblemished record of performance. Whether viewed singularly or collectively, it is apparent that plaintiff is merely quibbling with defendants' decisions regarding the administration of its attendance policy. And of course, it is not our prerogative to sit as a super human recourses department and re-examine defendant's business decisions. Keller, 130 F.3d at 1109 ("As another court of appeals has put it, 'federal courts are not arbitral boards ruling on the strength of 'cause' for discharge. The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination].") (quoting Carson v. Bethlehem Steel Corp., 82 F.3d 157, 159 (7th Cir.1996)); accord Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 332 (3d Cir. 1995) ("We do not sit as a super-personnel department that reexamines an entity's business decisions.) (quoting McCoy v. WGN Continental Broadcasting Co., 957 F.2d 368, 373 (7th Cir. 1992)). Consequently, defendant's motion for summary judgment on plaintiff's retaliation claim must be granted as well.

For the reasons set forth above, defendant's motion for summary judgment must be granted. An appropriate order will follow.

Date: September 25, 2012

s/David Stewart Cercone
David Stewart Cercone
United States District Judge

cc:   David M. Huntley, Esquire
      Lisa M. Goodman, Esquire
      W. Scott Hardy, Esquire
      Thomas H. Barnard, Esquire
      LerVal M. Elva, Esquire

      *(Via CM/ECF Electronic Mail)*